### SHERIDAN *v.* PENINSULAR SAVINGS BANK.[1]

1. BREACH OF CONTRACT—CHANCERY APPEAL—EVIDENCE.
    So much of a decree as awarded damages to complainant, based upon a finding that, as a part of the contract between the parties, defendants were to make certain advances to aid in its performance, which they failed to do, was reversed, as not warranted by the evidence.

2. VENDOR AND PURCHASER—INSURANCE—RIGHT TO FUND.
    A vendee in a land contract requiring him to keep the premises insured, who takes out insurance payable to himself as his interest may appear, is entitled to the proceeds of the policy, as between himself and the vendor, where the damage sustained is repaired by him at his own expense.

Appeal from Kent; Adsit, J.   Submitted January 5, 1898.   Decided April 5, 1898.

Bill by Thomas J. Sheridan against the Peninsular Savings Bank of Detroit, and others, for the cancellation of a contract and for other relief.   From a decree for complainant, defendants appeal.   Modified.

---

[1] Rehearing denied June 28, 1898.

The following is the contract referred to in the opinion:

"Memorandum of agreement, made this 24th day of March, 1896, between Thomas J. Sheridan, of Grand Rapids, Kent county, Michigan, party of the first part, and Charles I. Farrell and Frank Howard, of Detroit, Michigan, and S. H. Lasley, of Muskegon, Michigan (constituting a committee heretofore appointed to bid in and sell the Whitehall Lumber Company's sawmill property at Cheboygan, Michigan, in the foreclosure suit of S. H. Lasley, Trustee, v. The Whitehall Lumber Company and I. M. Weston, of Grand Rapids, Michigan), parties of the second part, witnesseth that—

"*Whereas*, the said first party has heretofore made a proposition to purchase the property of the said Whitehall Lumber Company, and to make certain improvements thereon, which is hereby deemed a part hereof, and is desirous of obtaining immediate possession for the purpose of making such improvements, and in order to close contracts for the sawing and manufacturing of lumber, as well as other purposes; and—

"*Whereas*, the parties of the second part are desirous, in case said Whitehall Lumber Company's property be bid in by them, or by anybody in their behalf and interest, of selling the same to the said party of the first part, and are therefore willing that said party of the first part should have immediate possession of said property for the purpose of making the improvements contemplated, and running and operating said plant until said foreclosure sale; and—

"*Whereas*, in order to effect said sale, the property will have to be hereafter advertised, thereby necessitating a delay until on or about July 1st next, at which time it will be too late to make the repairs contemplated, or to obtain contracts for sawing and manufacturing lumber for the season of 1896:

"Therefore it is hereby mutually agreed as follows:

"(1) That the said party of the first part hereby agrees to purchase said property, known as the 'Whitehall Lumber Company's Property,' consisting, generally, of mill, land, booms, machinery, appurtenances, water rights, privileges, easements, and advantages, intending to constitute the entire plant and outfit of the said Whitehall Lumber Company at Cheboygan, Michigan, from the said parties of the second part, in case it be sold to them, or anybody in their behalf and interest, and to pay therefor

the sum of twenty-nine thousand ($29,000) dollars over and above the improvements to be placed thereon, which payment shall be made as follows: Twenty-five thousand ($25,000) dollars thereof to the said parties of the second part, or to whomsoever they shall direct, and four thousand ($4,000) dollars thereof to Thomas F. McGarry, of Grand Rapids, Michigan, or to whomsoever he shall direct,—which payment shall be made as follows: Twenty (20) per cent. two (2) years from date hereof, twenty (20) per cent. three (3) years from date hereof, thirty (30) per cent. four (4) years from date hereof, and the balance five (5) years from the date hereof, with interest thereon at the rate of six (6) per cent. per annum upon all sums unpaid, payable semi-annually.

"(2) And the said party of the first part further agrees, in consideration of the premises aforesaid, to improve and place improvements upon said property during the year 1896 in manner and form satisfactory to said party of the first part, not less than three thousand ($3,000) dollars, nor exceeding in amount the sum of six thousand ($6,000) dollars, and to immediately, upon obtaining possession, commence making such improvements; also, to pay all taxes on said property from the date hereof, and to keep the said property insured in amount of fifteen thousand ($15,000) dollars in good board insurance companies, which amount may be decreased in proportion as the principal is reduced by payment.

"(3) And the said parties of the second part hereby agree, in consideration of the premises aforesaid, in case they purchase or bid in said mill at said foreclosure sale, or in case the same be bid in or purchased by any person or persons in their behalf and interest, they will immediately close contract with said party of the first part for the sale and purchase thereof, retaining the title in themselves until paid for, upon the terms and conditions above set forth. And it is further agreed that the said party of the first part may take immediate possession of said sawmill property for the purpose of making the necessary repairs and improvements, as well as for doing any other business during the coming sawing season, and may operate said mill until said foreclosure sale is made.

"(4) And it is further agreed that, in case the said second parties, or any one in their behalf or interest, should not become the purchaser or purchasers at said sale, and said property should be sold to some third or outside party,

who will not carry out the above-mentioned contract, then, in that event, the said party of the first part shall be entitled to have refunded from proceeds of sales of the property to him, from the avails of said property, from the said parties of the second part, all moneys expended for repairs and improvements, insurance and taxes, and any other necessary expenditures or disbursements, together with ten ($10) dollars a day for his time spent in or about said business, and to be relieved and saved harmless from any contracts for repairs, betterments, or improvements which may not at any time be fully consummated or concluded, as well as to be indemnified and saved harmless from any and all sawing contracts for the sawing or manufacture of lumber, at not less than two ($2) dollars, which said party of the first part may prior to that time enter into, said party of the first part paying ten ($10) dollars per day rental for the use of said mill and property for each and every day that same shall have been operated; which payment to said first party by said second parties shall be made within a reasonable time after such sale, the said first party retaining possession of said mill and operating the same until said payment shall be made.

"In witness whereof, the said parties have hereunto set their hands and seals the day and year first above written.

"C. I. FARRELL.
"FRANK HOWARD.
"THOMAS J. SHERIDAN.
"S. H. LASLEY."

*Uhl, Hyde & Earle*, for complainant.

*Brennan, Donnelly & Van De Mark*, for defendants Peninsular Savings Bank of Detroit and Frank Howard.

*U. Grant Race*, for defendants Home Savings Bank of Detroit and Charles I. Farrell.

*Kingsley & Kleinhans*, for defendants Whitehall State Savings Bank and S. Henry Lasley.

*George W. Bell*, for defendants First National Bank of Cheboygan and W. J. Stewart, Jr.

*George W. Radford*, for defendant First National Bank of Chicago.

Long, J. This bill is filed to cancel a certain contract and for an accounting. It appears that the ·Whitehall Lumber Company, in January, 1893, owned a sawmill plant at Cheboygan, this State. It had become largely indebted, and to secure that indebtedness made a trust mortgage for about $54,000. The Whitehall State Savings Bank was the principal secured creditor, holding about 60 per cent. of the indebtedness. The other defendant banks and defendant Stewart were the other beneficiaries. S. Henry Lasley was named as trustee. Isaac M. Weston was president of the Whitehall Lumber Company, and indorser upon a large amount of the paper secured by the trust mortgage. The property was to be sold under this mortgage, when, on March 12, 1896, the following written authority to act was made:

"We agree that Charles I. Farrell and Frank Howard, of Detroit, and S. H. Lasley, of Muskegon, Michigan, shall be a committee representing the creditors under a mortgage to S. H. Lasley, trustee, covering the Whitehall Lumber Company's sawmill property at Cheboygan, Michigan, which is soon to be sold under said mortgage, to bid in said property, in the name of some person to be selected by them, in behalf of said creditors, for $25,000, unless a better bid is made; and said committee shall have power and authority to resell the said property to the best advantage at a price not less than $25,000, or they may operate or lease said sawmill property in case it cannot be resold."

This agreement was signed by all the bank defendants and by defendants Weston and Stewart. The property was purchased in at the foreclosure sale on June 5, 1896, in the name of Mr. Farrell, and a deed subsequently given on such sale.

The complainant's claim is that in January, 1896, and before Mr. Farrell took title to this property, one Charles F. Cobb, of Grand Rapids, claiming to have this property for sale, made representations to him of its great value, and offered to sell it for $35,000; that, upon a written statement made by Mr. Weston, which Cobb pro-

duced, he went to Cheboygan, and looked the property over; that on his return he wrote Cobb, if the owners would put in a new battery of boilers and smokestack, he would take the property at the price named; that, after this letter was written, complainant had an interview with defendants McGarry and Weston, who complainant now claims represented the mortgage creditors at that time, and then made the same proposition to them which he had made in his letter to Cobb; that Mr. Weston refused to submit this proposition; that he then submitted to Weston the proposition that the owners furnish $3,000, as he estimated it would require about $7,000 to complete the necessary repairs. In this proposition complainant proposed, if the owners would furnish that amount:

"I will give them security on my block on Kent street, this city, for same, and purchase the mill at the price named,—I to get credit for the $7,000 needed to repair the mill; I to pay the $3,000 loan advanced on my block within 20 months from date of contract."

Complainant claims that this proposition was objected to by Mr. Weston on the ground that, if a battery of boilers not paid for was put in, and the complainant failed to pay, it would be taken out of the mill, and leave it unfit to run; that a new proposition in writing was then submitted to obviate that objection, in which the old boilers were to be left in and repaired, and certain other improvements made, which complainant claimed would give 75 additional horse power. This writing then stated:

"This, although not giving us the necessary horse power for a double band mill, will give us about 60 horse power more than there is at present, and, with the Allis hog, which I intend to put in for cutting up edgings and other refuse to mix with the sawdust for fuel, will give a much better and steadier fire, and consequently the old battery should furnish more steam than it has heretofore. In regard to payments on the mill, as I have no stock of logs on hand, I would not want to pay more than the interest, taxes of the current year, and improvements the first year," etc.

On February 3, 1896, a new proposition was submitted, in writing, which recites the condition of the mill, the needed improvements and repairs, that it would take about $7,000 to make them, that complainant would make them if the owners would loan him $3,000 on his Kent-street property, and that he would take the mill at the price named, and would pay the loan within 20 months. It also mentioned the same mode and terms of payment as the other proposition. Complainant contends that this proposition was satisfactory to Mr. Weston, who then said he wanted but two things more, and he would go to Detroit and see the banks: *First*, a statement of complainant's reputed worth; and, *second*, an estimate of the cost of these repairs; that the estimates as to cost of repairs were furnished, and also a statement showing that complainant was a man of considerable means, but had no ready money; and that Mr. Weston took these propositions to Detroit, and, on returning, said the parties were satisfied.

It is further claimed that Mr. Weston told the Detroit creditors that the complainant had made a proposition to purchase, but to make no cash payment,— the improvements to stand as first payment. It is further claimed that Mr. Haass, who represented the Detroit creditors, did not inquire whether this proposition was in writing or not, but that he afterwards came to Grand Rapids, and met complainant, Weston, McGarry, and Cobb; that an understanding was had before that between McGarry, Weston, and Cobb that they were to have $4,000 as commissions on the sale to complainant; that, while Haass was in Grand Rapids, McGarry finally agreed to raise the $3,000 on the Kent-street property in consideration thereof, and Haass was informed that McGarry would raise the money; that complainant made a deed of the property, with defeasance back, so that McGarry could raise the money; that on March 14th complainant prepared a statement as to what he should require in the way of a preliminary contract, stipulating that the contract should be

"executed in accordance with my proposition of February 3, 1896;" that the parties met in Detroit on March 24th to arrange for this contract; and that before that time Mr. Weston told Mr. Haass and other Detroit creditors, and Mr. Lasley, of Muskegon, that McGarry was going to raise this $3,000, and had made arrangements with Ionia parties for it.

It is further claimed that, after reaching Detroit, and before meeting with the Detroit creditors, Mr. McGarry drafted a contract, which was thereafter submitted to the committee of the creditors, consisting of Farrell and Howard and Mr. Weston, acting for Mr. Lasley; that Mr. Haass was also present, and suggested that the contract be submitted to the attorneys of the creditors; that this was agreed to, and the contract, after being so submitted, and signed by Farrell and Howard, was to be forwarded next day to complainant. In this connection, it is contended that Farrell and Howard stated that the contract was satisfactory, and that Farrell asked complainant if it was satisfactory to him, and that he responded that it was if the $3,000 was furnished as soon as the contract was signed, and that he proposed to secure the advance of the $3,000 on his Kent-street property, which they could examine. Three copies of the contract drawn by McGarry were made, and complainant signed one of them, and left it with the committee, who, it is claimed, agreed to sign next day, and return it to complainant. Before this contract was finally signed, and on April 3d following, the committee wired McGarry that the complainant would be required to give a bond to secure the outlay of $2,000 or more within 40 days from the date of delivery of contract. This bond was given, and the contract finally signed, on April 11, 1896. A copy of this contract will be found in the statement. It appears that McGarry failed to arrange for the money. The complainant entered upon the contract, got the mill ready, and commenced operations on June 2d. It is contended by complainant that he was unable to raise this money, and, consequently, he was un-

able to increase the power of the mill, which resulted in a serious loss to him of from $30 to $50 per day while the mill was running.

Complainant procured insurance, as provided in the contract, on the property, for $3,500,—loss, if any, payable to himself as his interest might appear,—and on July 25th the docks connected with the mill were burned. The complainant at once notified the committee of the loss, and asked that money be advanced by it to enable him to rebuild the docks; and it is claimed that Mr. Haass, for the committee, promised that it should be advanced. The docks were reconstructed by complainant's brother for the $3,500. No moneys were furnished for the payment of this amount, and the committee refused to allow the insurance money to be paid to complainant. The claim is that by reason of the failure of the committee to raise this $3,000, and the withholding of the insurance money, the complainant was unable to meet his obligations, and was compelled to shut down the mill. The bill is filed to obtain a cancellation of the contract, for an accounting for the moneys expended by the complainant in the repair of the mill, for damages caused by a breach of the contract, and to recover the insurance money or the cost of rebuilding the docks, and to restrain the payment of the insurance money to Mr. Farrell. . All of the defendants answered the bill, except defendant Stewart.

It will be noticed that the theory of the bill is that this committee was fully authorized by this power of attorney to enter into this contract, including in it a promise to advance the $3,000, and that under the arrangement defendants became bound to advance that sum. It is also insisted that the testimony introduced showed clearly that the preamble in the contract, when taken in connection with the propositions made by complainant, meant that the defendants should furnish the $3,000, and that testimony was properly received to explain the preamble. It is also claimed that Cobb, Weston, and McGarry were the agents of the sellers, and that the arrangements made by them in

reference to the $3,000 are binding upon the defendants, who were represented by this committee.

We find nothing in the record showing that those parties were the agents of the sellers. It appears that an arrangement was made between the parties by which they were to have a commission of $4,000. It was specified in the contract that the purchase price should be $29,000, and out of this McGarry, Cobb, and Weston were to receive their commission of $4,000. These parties were never employed to sell these lands. Mr. Cobb, learning that the lands were for sale, approached complainant, and asked him to buy. Weston and McGarry were let into the arrangement, and McGarry was to raise the $3,000 on the Kent-street property with which to make the improvements. The improvements were expected to cost about $7,000; but, as the contract was finally drawn (and it was drawn by McGarry in presence of complainant), complainant was to put on improvements of not less than $3,000, and possibly $6,000, if necessary. Mr. Haass testified that, while at Grand Rapids, he told complainant he would not advance any money for repairs, and that complainant must arrange the matter in Grand Rapids, and that McGarry thought he could get the money from Ionia parties, taking security on complainant's Kent-street property. The committee who were authorized to make the sale had never been notified that they were expected to advance the $3,000. Two days before going to Detroit, Weston wrote to Haass that the parties were coming, and that complainant had arranged to raise the $3,000. But complainant testified that he told Farrell, in Detroit, at the time the contract was drawn, that he expected the committee to raise the $3,000. This is denied by Farrell and Howard; and they say that they asked complainant how he was going to get the money, and he said that he had his arrangements all made to raise it on his Grand Rapids property. When we take into consideration the letter written by Weston that complainant had so arranged, and the fact that McGarry expected

so to arrange it, we are satisfied that Farrell and Howard were right in saying that they were not to advance the money.    Even as late as August 5th, complainant wrote Mr. Lasley, asking friendly assistance, and in that letter no claim is made that the committee was to furnish this money, and no complaint that it was not so furnished. Another circumstance that tells strongly against the complainant is that he started up the mill on June 2d without asking the committee for the money, though he had been informed, the latter part of May, that McGarry could not raise it.    It also appears that, while complainant, Weston, and McGarry were on the train from Grand Rapids to Detroit, Mr. Weston drew up another proposition, which Weston testifies the complainant looked over and assented to.    This, Mr. Weston testified, was the only proposition which he submitted to the committee, and it contained no provision for advancing to complainant $3,000 for repairs.

The court below made a decree finding that the proposition of February 3, 1896, was a part of the contract; that complainant sustained damages by its breach to the amount of $6,824.87; and that complainant recover from the defendants, except McGarry, Weston, and the Globe Insurance Company, the said damages.    This part of the decree must be reversed.    The court also made a decree disposing of the insurance money, which had been paid into court, providing that, after payment to the insurance company of its costs, etc., the balance be paid over to complainant's solicitors, and then directed the disposition which should be made of the fund by them; that is, in the payment of the labor bills for the construction of the trams and docks and other improvements.    We do not think this part of the decree should be disturbed, as the insurance money was to be paid to complainant as his interest might appear.    He rebuilt the docks, costing about the amount of the insurance.    Defendants will recover their costs of this court.

MONTGOMERY, HOOKER, and MOORE, JJ., concurred. GRANT, C. J., did not sit.